**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                               )
SKYVIEW FINANCE CO., LLC,       )
                               )
                Plaintiff,      )
                               )        Civil Action
v.                              )        No. 20-cv-11666-PBS
                               )
KEARSARGE TRADING, LLC,         )
                               )
                Defendant.      )
                               )
_____)
```

**MEMORANDUM AND ORDER**

July 18, 2022

Saris, D.J.

**INTRODUCTION**

This case involves the termination of contracts between Plaintiff Skyview Finance Company, LLC ("Skyview") and Defendant Kearsarge Trading, LLC ("Kearsarge") for the purchase and sale of Solar Renewable Energy Credits ("SRECs"). Skyview brings this action for breach of contract (Count I) and violation of Mass. Gen. Laws ch. 93A (Count III).[1] Kearsarge moves for summary judgment on the Chapter 93A claim, arguing Chapter 93A does not apply to breach of contract actions except in narrow circumstances (like the presence of an ulterior motive) not present in this case.

---

[1] This Court dismissed Count II (unjust enrichment). See Dkt. 44.

After hearing, for the reasons below, the Court **ALLOWS** Defendant's Motion for Summary Judgment (Dkt. 64).

## FACTUAL BACKGROUND

### I.   The Three Contracts

Kearsarge and Skyview are traders of SRECs, environmental commodities traded on the open market, subject to fluctuations in price. Between January and March of 2018, the parties entered into three contracts under which Kearsarge agreed to sell Skyview SRECs at a future time at a fixed unit price of $307.50 for 2020 SRECs and $300 for 2021 SRECs, a $2,138,000 total purchase. A fourth contract, not at issue in this case, was agreed to in March 2018 with a purchase price of $620,000.

The three contracts contain identical language, other than the prices, quantities, and dates. They each contained a limitation of liability clause. See, e.g., Dkt. 93-1 § 6.3. Section 4.5 entitled either party to request prompt delivery of the "most recently available annual report containing audited consolidated financial statements." Id. § 4.5 (emphasis added). Section 6.4 provided:

> Should either Party have reasonable grounds to believe that the creditworthiness of the other Party has become unsatisfactory or the ability of the other Party to perform its obligations under this Agreement has become impaired, then the dissatisfied Party (the "Requesting Party") may demand that the other Party (the "Posting Party") provide assurance of its ability to perform its obligations hereunder in an amount determined by the

Requesting   Party   in   its   commercially   reasonable
discretion.

Id. § 6.4.

## II.   Negotiations for a Fifth Contract

In   June   2018,   the   parties   negotiated   for   a   fifth   contract
with a total purchase price of $1,067,500. When Skyview noted that
it "may be reaching [its] credit limit" with Kearsarge and asked
how to solve this, Kearsarge responded, "We are not looking to do
any more hedging. We have a good exposure with you so we are set."
Dkt. 66-6 at 2-3. In back-and-forth emails, Kearsarge reiterated
that it had "almost 3 million of exposure" with Skyview and so
would require a letter of credit ("LC") or some other collateral
from Skyview for any additional contracts. Dkt. 66-7 at 8. There
was "[j]ust too much risk." Id. Kearsarge explained its new CFO
felt it was exposed to the risk of needing to find another buyer
to resell the SRECs if Skyview was unable to buy them, see Dkt.
66-8 at 2, and so it cancelled the new contract because it was
"too exposed." Dkt. 66-9 at 2.

## III.   Kearsarge Requests "Latest Financials"

On   June   15,   2020,   Kearsarge   emailed   Skyview,   "We   have   a
serious [sic] of 2020 SREC contracts (3 in 2020 and 1 for 2021).
Per the contract section 6.4, Could [sic] you please send us your
latest   financials?"   Dkt.   66-10   at   4.   Skyview   responded,   "Our
financials are under review by our auditors and will be ready in

the next few weeks." Dkt. 66-10 at 4. A month later, Skyview sent the "final version" of its financial statements, which were reviewed by auditors, but were not actually audited. Kearsarge responded, "We will get back to you tomorrow, but we will need a surety or a LC." Id. at 2.

In an internal email, Kearsarge's CFO expressed numerous concerns based on these financial statements and expressed that he "can keeping digging if we need more points," but "would definitely ask for collateral (surprise)." Dkt. 93-10 at 1. He also expressed that he "would not rely too much on" the financials because they were not fully audited. Id. On July 29, 2020, Kearsarge reiterated these concerns to Skyview and explained that it would require a surety to be set up within the next two weeks.

### IV.  Kearsarge Communicates an Intent to Terminate

On August 3, 2020, Kearsarge emailed Skyview that it was exercising its termination rights under the contract "effective as of today" because Skyview had failed to deliver an adequate assurance within two business days, as required by § 6.4 of one of the contracts. Dkt. 66-15 at 6. Skyview responded by "reject[ing the] purported termination." Id. at 5. Skyview argued that Kearsarge's July 29 email had not met the requirements of a "demand," that the request for a surety within two weeks was not a demand for something within two days, and that any demand was unreasonable. Id. Skyview asserted that it was credit-worthy and

4

able to pay, particularly because it had paid in full on the fourth contract on July 29, so there was no objective and reasonable basis for the demand. Skyview summarized, "[Y]our pretextual allusions to Skyview's diminished ability to pay are absurd. . . . If you simply want to re-trade or get out of the deal to go transact with an investment grade counterparty, we are happy to cash settle these contracts for the current market value, which has increased by approximately $337,000 since we entered into the contracts." Id. at 6.

After some back and forth, on August 7, 2020, Kearsarge sent a default letter to Skyview expressing that the unaudited financial statements were "not satisfactory" or in the form required by § 4.5 of the contracts, and that this alone constituted an event of default under the contracts. Dkt. 66-16 at 3. The letter reiterated Kearsarge's concerns justifying a demand for adequate assurances, and because the July 29 email had given a two-week deadline, rather than the contractual two days, Kearsarge provided an August 12 deadline for the delivery of both satisfactory financial statements and a bond or letter of credit, or else Kearsarge would exercise its termination rights.

### V.   **Skyview Terminates the Contracts**

In response to the letter of default, Skyview sent its unaudited "final reviewed financial statements for 2019" and requested, pursuant to § 4.5 of the contracts, Kearsarge's most

5

recent financial statements. Dkt. 99 at 4. Skyview also asked for Kearsarge's calculations of its exposure. On August 11, 2020, Kearsarge sent the calculations, but not its own financial statements, and told Skyview that its deadline to post a letter of credit was 5:00 pm on the 12th.

At 4:08 pm on the 12th, Skyview sent Kearsarge a notice of termination asserting that Kearsarge had "made objectively false claims about Kearsarge's purported 'insecurity'" with no objective basis. Dkt. 66-18 at 2. It explained that Kearsarge's demands caused it to become "concerned about [Kearsarge's] intent to honor" the contracts, particularly "because the market value of SRECs ha[d] increased, and Skyview would suffer monetary damages if Kearsarge were to default under [the] Contracts." Id. Based on Kearsarge's failure to provide financial statements or adequate assurances, and its "repeated [] intent to repudiate [the] Contracts unless [Skyview] accede[d] to [its] demands for collateral posting that have no commercially reasonable basis," Skyview terminated the contracts, effective immediately. Id.

Skyview notes that between January 2018, the month the first contracts were signed, and June 2020, when Kearsarge requested Skyview's financials, the market value of SRECs had risen from $310 to $360 per 2021 SREC and from $290 to $342 for 2020 SRECs.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it has the potential of determining the outcome of the litigation." Maymi v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008). "A genuine [dispute] exists when, based on the evidence, a reasonable jury could resolve the issue in favor of the non-moving party." Napier v. F/V DEESIE, Inc., 454 F.3d 61, 66 (1st Cir. 2006). "It is elementary that at summary judgment a court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the same." Chadwick v. WellPoint, Inc., 561 F.3d 38, 41 (1st Cir. 2009). That said, "conclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment. Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (quotation omitted); see also Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 18 (1st Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) ("'[T]he mere existence of a scintilla of evidence' is insufficient to defeat a properly supported motion for summary judgment.").

The moving party bears the initial burden of "identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "Where the ultimate burden of persuasion rests on the non-moving party, and the moving part[y] has met its initial burden, the burden then shifts to the non-moving party to show that a trier of fact could reasonably find in the non-moving party's favor." Rothschild v. Cree, Inc., 711 F. Supp. 2d 173, 180 (D. Mass. 2010) (citing Celotex, 477 U.S. at 324).

## DISCUSSION

Kearsarge moves for summary judgment on the Chapter 93A claim on three grounds: (1) ch. 93A does not apply to this breach of contract action, (2) Skyview cannot claim ch. 93A damages for its own termination of the contracts, and (3) ch. 93A damages are precluded by the contracts' limitation of liability clauses.[2]

Chapter 93A declares unlawful any "unfair or deceptive acts or practices in the conduct of any trade or commerce." M.G.L. c. 93A, § 2. A 93A plaintiff must prove the defendant "committed an unfair or deceptive trade practice and that [the plaintiff] suffered a loss of money or property as a result." Bowers v. Baystate Techs., Inc., 101 F. Supp. 2d 53, 54-55 (D. Mass. 2000)

---

[2] Because this Court finds ch. 93A does not apply to this breach of contract action, it does not reach the other two arguments.

(citing <u>Alan Corp. v. Int'l Surplus Lines Ins.</u>, 823 F. Supp. 33, 43 (D. Mass. 1993)). To this end, Skyview must demonstrate that Kearsarge's actions "fell 'within at least the penumbra of some common-law, statutory or other established concept of unfairness,' or were otherwise 'immoral, unethical, oppressive or unscrupulous.'" <u>Bowers</u>, 101 F. Supp. 2d at 55 (quoting <u>PMP Assocs., Inc. v. Globe Newspaper Co.</u>, 321 N.E.2d 915, 917 (Mass. 1975)); <u>see also</u> <u>Levings v. Forbes & Wallace, Inc.</u>, 396 N.E.2d 149, 153 (Mass. App. Ct. 1979) ("The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.").

Breach of contract, without more, does not amount to a 93A violation. <u>Monotype Imaging Inc. v. Deluxe Corp.</u>, 883 F. Supp. 2d 317, 323 (D. Mass. 2012) (citation omitted). Even a breach based on a "plausible, although ultimately incorrect, interpretation of" a contract does not violate c. 93A. <u>Bos. Symphony Orchestra, Inc. v. Comm. Union Ins. Co.</u>, 545 N.E.2d 1156, 1160 (Mass. 1989). And the mere fact "that a party knowingly breached a contract does not raise the breach to the level of a Chapter 93A violation." <u>Ahern v. Scholz</u>, 85 F.3d 774, 798 (1st Cir. 1996).

"In some cases, however, the facts giving rise to a breach of contract claim will also give rise to a Chapter 93A claim" if "some level of bad faith [is] present." <u>Monotype Imaging Inc.</u>, 883 F. Supp. 2d at 323. A contract dispute can give rise to a 93A claim,

for example, if there is evidence that the breaching party acted with an "ulterior motive" or "coercive or extortionate objective." Framingham Auto Sales, Inc. v. Workers' Credit Union, 671 N.E.2d 963, 965 (Mass. App. Ct. 1996); see also Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 822 (Mass. 1991) (holding a "knowing use of a pretext to coerce" another party into paying more than was contractually required was a willful violation of c. 93A); Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55 (1st Cir. 1998) (upholding a finding that a defendant violated 93A by withholding payment and stringing out the process with the intent to force the plaintiff into an unfavorable settlement).

Here, Skyview argues that the increase in the market price of SRECs supports a reasonable inference that Kearsarge had an ulterior motive. However, the emails support Kearsarge's contention that it was concerned with its exposure—the financial risk that it would need to find another buyer if Skyview was unable to pay for the SRECs. Skyview asserts that Kearsarge's purported concerns about risk were a pretext, but it has not unearthed a single email or cited any deposition testimony that corroborates its argument that Kearsarge was really hoping to negotiate with parties who would pay a higher price. For example, Skyview relies on the emailed statement, "We have good exposure with you," Dkt. 66-6 at 2, to demonstrate Kearsarge did not have a real concern about risk, but this was in response to a request to increase the

exposure with a fifth contract. Skyview also argues that the concerns must have been pretextual because, in its view, there were no reasonable grounds to question its ability to perform, but this is essentially an argument that Kearsarge breached the contracts and is therefore more properly handled through Count I.

**ORDER**

After hearing, for the reasons stated above, the Court **ALLOWS** Defendant's Motion for Summary Judgment on Count III (Dkt. 64).


SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge