**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                        )
SKYVIEW FINANCE COMPANY, LLC,           )
                                        )
                    Plaintiff,          )
                                        )          Civil Action
          v.                            )          No. 20-11666-PBS
                                        )
KEARSAGE TRADING, LLC,                  )
                                        )
                    Defendant.          )
_____)

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

Saris, D.J.

**INTRODUCTION**

Plaintiff Skyview Finance Company, LLC ("Skyview") brings this action against Defendant Kearsarge Trading, LLC ("Kearsarge") to recover damages incurred when Kearsarge allegedly breached several contracts for the purchase and sale of Solar Renewable Energy Credits ("SRECS"). Kearsarge counters that Skyview was the breaching party. After a five-day bench trial, the Court finds that Kearsarge materially breached the contracts. Judgment shall enter for Skyview in the amount of $342,742 in damages and $250,000 in attorneys' fees for a total of $683,570.14 plus prejudgment interest at 12%.

**FINDINGS OF FACT**[1]

I.  **Background**

    A.  **Solar Renewable Energy Credits**

Solar Renewable Energy Certificates ("SRECs") are tradeable environmental commodities representing one megawatt hour of electricity generated from solar energy.  In some states, Massachusetts included, regulations known as Renewable Portfolio Standards ("RPS") require electricity suppliers to generate a portion of their electrical power from a renewable energy resource. Load-serving entities or utilities can purchase SRECs to ensure their compliance with RPS.  State regulatory bodies levy an alternative compliance penalty ("ACP") against entities that fail to comply with RPS.

The year that an SREC is generated is known as a vintage year. Following production, SRECs are then "minted," i.e., certified, by a regulatory entity on a quarterly basis.  Parties can enter into forward contracts based on SRECs that have not yet been generated or minted; that is, they contract to purchase SRECs identified by a future vintage year at a set price.  The SRECs are generally delivered to the buyer on a rolling basis as they are minted.

Any SRECs that are generated but not sold on the market may be entered in a clearinghouse auction.  In Massachusetts, there is

---

[1] The Court states its findings of facts and conclusions of law separately, as required by Federal Rule of Civil Procedure 52(a)(1).

a minimum price of $285 per SREC sold at auction.  Since 2015, the auction has never failed to clear, meaning that all residual SRECs were successfully sold during the auction.  However, there is no guarantee that all SRECS will be sold.

### B.   **The Parties**

Plaintiff Skyview is a consolidator and trader of SRECs, reselling them to load-serving entities or utilities.  Defendant Kearsarge is an independent producer of renewable energy that generates SRECs.  Both entities are privately held and non-investment-grade, meaning they are not reviewed and rated by a credit ratings agency.

### C.   **The Contracts**

This dispute concerns six contracts between Skyview and Kearsarge executed between February 20, 2017, and April 13, 2018. The six contracts were prepared using the same form of Sale and Purchase Agreement but with different commercial terms.  The commercial terms included the number of SRECs to be sold, the SRECs vintage year, and the purchase price.

The provisions most relevant to this dispute are Section 4.5 and Section 6.4:

ARTICLE 4.5 FINANCIAL STATEMENTS
    Upon the request of a Party, the other Party shall
    promptly deliver to such Party a copy of its or its
    credit support providers', as applicable, most recently
    available annual report containing audited consolidated
    financial statements and quarterly unaudited
    consolidated financial statements, in each case prepared

in accordance with generally accepted accounting principles, consistently applied. Upon the delivery of any financial statements, the delivering Party shall be deemed to represent and warrant to the other Party that such financial statements are a fair presentation in all material respects of the financial condition of the Party or its credit support provider, as applicable, and its results of operations for the period covered by such financial statements.

Trial Ex. 3 at KEARSARGE324.

ARTICLE 6.4 ADEQUATE ASSURANCES
Should either Party have reasonable grounds to believe that the creditworthiness of the other Party has become unsatisfactory or the ability of the other Party to perform its obligations under this Agreement has become impaired, then the dissatisfied Party (the "**Requesting Party**") may demand that the other Party (the "**Posting Party**") provide assurance of its ability to perform its obligations hereunder in an amount determined by the Requesting Party in its commercially reasonable discretion. Such assurance includes (i) posting of a letter of credit in favor of the Requesting Party by an issuing bank reasonably acceptable to the Requesting Party, (ii) posting of cash collateral with the Requesting Party, or (iii) providing other security reasonably acceptable to the Requesting Party. The Posting Party shall provide such assurance within two (2) Business Days following demand therefor.

Id. at KEARSARGE326.

These provisions were not negotiated or discussed during contracting.

Two other provisions regarding payment risk, which is a buyer's ability to pay for the SRECs upon delivery, were negotiated. Prior to entering into Contract 1 on February 20, 2017, Andrew Bernstein, Kearsarge's CEO and managing partner, expressed concern about his payment risk. Bernstein confirmed to

Andrew Karetsky, President of Skyview, that he was not concerned about market risk, which refers to the risk that a buyer or seller faces that the market price will move unfavorably against them, and the counterparty is therefore motivated not to perform the contract. On February 20, 2017, Bernstein informed Karetsky that he did not want to add extra costs by demanding a letter of credit, but that he would like some other form of security to address the payment risk.  In response, Karetsky proposed modifying the provision addressing further assurances as follows:

ARTICLE 3.2 FURTHER ASSURANCES; TITLE
> The Parties shall cooperate fully and assist each other to obtain any and all required approvals and/or forms which may be required to effectuate the transfer of the Contract RECs to the Buyer's account with the Tracking System in accordance with this Agreement, and to comply with any and all other regulatory obligations as required by the Tracking System. Title and interest in the Contract RECs shall transfer upon Delivery to the Buyer's account with the Tracking System. **At any time not more than 30 days prior to a Delivery of RECs, the Seller may request and Buyer shall provide additional information as reasonably necessary to evaluate the then current credit of the Buyer and the ability of Buyer to pay the Purchase Price for the RECs to be delivered.  Upon the receipt of such information, or the refusal of Buyer to reasonably provide such information, Seller may request additional adequate assurances of performance pursuant to Section 6.4.**

Trial Ex. 6 at SKYVIEW-110(emphasis added).

Karetsky additionally proposed modifying the provision addressing payment to require payment in three days following delivery rather than five:

ARTICLE 4.2 PAYMENT
>     Within **three (3)** Business Days of the later of (x) Buyer's
>     receipt of an Invoice and (y) Buyer's receipt of confirmation
>     that the applicable Contract RECs have been Delivered to the
>     Buyer's account with the Tracking System, Buyer shall pay the
>     applicable portion of the Purchase Price to Seller. . . .

Tr. Ex. 7 at SKYVIEW-146 (emphasis added).

Bernstein accepted both of Karetsky's suggested modifications. These were the only changes that were made to Contract 1 before it was entered into on February 20, 2017.

All of the contracts thereafter adopted the provisions of Contract 1 outlined above but with differing commercial terms. Contract 1 (entered into on February 20, 2017), Contract 2 (entered into on October 3, 2017), and Contract 5 (entered into on March 27, 2018) were fully performed, while Contract 3 (entered into on January 17, 2018), Contract 4 (entered into on January 30, 2018) and Contract 6 (entered into on March 27, 2018) were terminated. The termination of Contracts 3, 4 and 6 form the basis of this dispute.

### D. **The Unconsummated Trade**

In June 2018, after the parties had entered into the six contracts described above, the parties were matched by a broker for an additional trade. While negotiating the commercial terms, Kearsarge requested from Skyview a letter of credit for the full notional value of the contract. Notional value refers to the contract price multiplied by the total number of SRECs to be

delivered.    Skyview   counter-proposed   alternative   means   of
addressing Kearsarge's payment risk such as prepayment prior to
delivery of the SRECs or a letter of credit for up to 6% of the
notional value.   Kearsarge rejected Skyview's proposals, and on
November 26, 2018, Kearsarge cancelled the trade. The relationship
remained amicable throughout 2018.

### E. The Bankruptcy Case

In 2019, Skyview purchased contracts pursuant to a Sale Order
issued in the unrelated Chapter 11 Bankruptcy of BBPC, LLC, d/b/a
Great Eastern Energy ("GEE"), then pending in the United States
Bankruptcy Court for the District of Delaware, Lead Case No. 19-
10303 (LSS) (the "GEE Bankruptcy").   On July 19, 2019, Skyview
moved to enforce the Sale Order, claiming that Kearsarge had
defaulted on its obligations under a July 7, 2016 agreement with
GEE.  Kearsarge disputed this and served Skyview with a Motion for
Sanctions.   On November 4, 2019, the parties entered into a
Settlement Agreement and Mutual Release.   The Motion for Sanctions
was never filed. Nonetheless, the relationship had soured as a
result of the litigation in the bankruptcy proceeding.

## II.   The Dispute over the Requested Letter of Credit

On June 15, 2020, after Contracts 1 and 2 had been fully
performed, Kearsarge emailed Skyview a request to review Skyview's
latest financials per Section 6.4 of their contracts.   Skyview
responded immediately that they were "under review by our auditors

and will be ready in the next few weeks." Trial Ex. 28 at SKYVIEW-650.   Kearsarge responded "OK thank you . . . We understand the delays but we have a lot of dollars involved here and may need some sort of security." Trial Ex. 26 at SKYVIEW-642.   After some further communication, Kearsarge stated that "[w]e have too much in trades now with [you].   We can review the financials and get back to you but most likely we will need some sort of surety." Id. at SKYVIEW-641-42.

After an additional request for financials from Kearsarge, on July 10, 2020, Skyview sent Kearsarge draft, reviewed financials, writing "We do not expect them to change much in the final version." Trial Ex. 28 at SKYVIEW-649. "Reviewed" financials refers to the level of scrutiny applied to the financial statements. "Reviewed" is the second level of scrutiny, less reliable than "audited" financials but more reliable than "compiled" financials. Skyview's draft financials indicated that Skyview had a line of credit of $8,000,000, which had expired in June 2020. It also included a notation that Skyview was in the process of extending its line of credit.

On July 15, 2020, Bernstein, who received the financials on behalf of Kearsarge, emailed a copy to his Chief Financial Officer, Marc Stewart, for review. In the email, Bernstein wrote "I want them to put up collateral . . . interested in what you think, be conservative." Trial Ex. 40 at KEARSARGE509. Bernstein followed

up on his email to Stewart, writing "[w]e can talk later. These are the guys that sued us." Id. at KEARSARGE508.  Stewart reviewed the financials and the following day sent an email to Bernstein detailing his concerns.  Stewart concluded that "I would definitely ask for collateral (surprise)."  Id. at KEARSARGE507  In particular, Stewart noted that the financials were not audited and "as such I would not rely too much on these . . . Maybe ask?"  Id. Stewart further noted that Skyview had a line of credit due June 30, 2020, and suggested it was "worth asking for status."  Id. at KEARSARGE508.

On July 16, 2020, Skyview sent its final, reviewed financial statements to Kearsarge.  The final, reviewed financials indicated that Skyview's line of credit had been extended on a month-to-month basis and Skyview was "in the process of extending the [line of credit] as of the date of the financial statement issuance." Trial Ex. 30 at SKYVEIW-711.  Eighteen minutes later, Bernstein responded "[w]e will get back to you tomorrow but we will need a surety or a letter of credit."  Trial Ex. 31 at SKYVIEW-725.  That same day, Kearsarge delivered to Skyview the final batch of SRECs due under Contract 5.   Thereafter, Skyview sent payment to Kearsarge for the SRECs, completing performance under Contract 5.

Two weeks later, on July 29, 2020, Bernstein followed up on his July 16, 2020 email and demanded a bond or letter of credit for the full notional value of the remaining contracts.  In his

email, for the first time Bernstein expressed dissatisfaction with the unaudited nature of Skyview's financials and the fact that Skyview's line of credit "was due June 30."   Trial Ex. 35 at SKYVIEW-734. He stated that he did "not feel comfortable on paying outstanding balances nor on the ability to cover trades especially is [sic] something goes South in these highly unusual and stressful times."   Id.   Bernstein wrote "I do not want to have a discussion on this . . . and the complexity here is not something we want nor need to spend the time understanding."   Id. at SKYVIEW-733.   The notional value of the outstanding contracts between Kearsarge and Skyview was $2,137,500.

## III.   **Termination**

On August 3, 2020, Bethany Bartlett, General Counsel for Kearsarge, sent Skyview an email purporting to terminate the contract signed March 27, 2016 and referencing Skyview's failure to provide assurances within two days of demand under Section 6.4 as the reason for termination.   However, two contracts (Contract 5 and Contract 6) were both entered into on March 27, 2018, and the parties had already fully performed on Contract 5.   The email did not specify which contract it purported to terminate.   At trial, Bartlett conceded that her email had been sent in error.

Later that day, Karetsky responded to Bartlett's email rejecting Kearsarge's termination notification.   Karetsky countered that Kearsarge had not made a sufficient "demand" for

adequate assurances under Section 6.4 and that, even if it had, a demand was not commercially reasonable as Skyview stood to gain by performing on the contracts given the current market price of SRECs.  Furthermore, Karetsky stated that Skyview had "cash on hand and a line of credit from Citibank that is more than sufficient to meet our working capital needs (including our payment obligations to Kearsarge) and to pay our debts as they become due." Trial Ex. 47  at KEARSARGE291.  Karetsky concluded by offering to cash settle the contracts at market value.

Bernstein replied on August 4, 2020, writing "[w]e followed the contract, we got no response and it is no [sic] terminated." He did not inform Karetsky that Bartlett's earlier termination had been sent in error.  Id. at KEARSARGE289.

Karetsky immediately responded with a request for clarification.  When neither Bernstein nor Bartlett replied, Karetsky send a follow-up email, saying "your emails continue to baffle us and fail to provide a clear statement of your positions on our contracts.  We would like you to clarify your various emails because we have no idea what you are asking for or what contract or contracts you are trying to repudiate."  Trial Ex. 48 at SKYVIEW-789.  Karetsky reiterated Skyview's position that Kearsarge never made a demand under Section 6.4 nor would such a demand have been reasonable.  Karetsky also pointed out that Skyview and Kearsarge had two contracts dated March 27, 2018 and

requested clarification regarding which contract Kearsarge purported to terminate. Finally, Karetsky asked whether Kearsarge intended to perform under the existing contracts.

On August 7, 2020, outside counsel for Kearsarge sent a letter to Skyview invoking Section 6.4 and demanding assurances in the form of a bond or letter of credit for the full value of Contract 3, Contract 4 and Contract 6 as well as "a compilation of reviewed financials from a certified public accountant." Trial Ex. 52 at KEARSARGE385 ("August 7 Letter"). The letter incorrectly stated that Skyview had only provided Kearsarge with draft financials. In fact, Skyview provided Kearsarge with final, reviewed financials on July 16. Although the letter referenced Section 4.5 under which the parties were obligated to provide audited financials upon request, it then stated that "the fact that Skyview has not been able to produce a compilation or reviewed financials from a certified public accountant is an additional fact that leads Kearsarge to question Skyview's ability to perform on the Kearsarge/Skyview Contracts." Trial Ex. 52 at KEARGARGE385. Later, the letter incorrectly stated that "Skyview's line of credit or other banking facilities have expired. While Skyview has represented otherwise, it has not offered any confirmation or evidence to the contrary." Id. at KEARSARGE386. Skyview's final, reviewed financials indicated that Skyview's line of credit had been extended on a month-to-month basis. The letter concluded:

> If Skyview is unable or unwilling to provide the financial statements as well as the requested adequate assurances on or before August 12, 2020, Skyview will be in default of the Kearsarge/Skyview Agreements pursuant to Section 1.5(f). Please be advised that Kearsarge intends to exercise its termination rights under Section 6.1 if Skyview fails to satisfy its obligations on or before August 12, 2020.

Id. Again, the letter did not clarify that Kearsarge's earlier purported termination was issued in error.

On August 10, 2020, Karetsky responded by resending Kearsarge its final, reviewed financial statements and requesting that Kearsarge send its most recent annual financial statements pursuant to Section 4.5. In addition, Karetsky responded to some of the issues raised in the August 7 Letter. In particular, Karetsky stated that Citibank had extended Skyview's line of credit and was in the process of significantly increasing its size. He offered to provide references from Skyview's bank and mutual SREC trading counterparties and brokers. He also reiterated his proposal to prepay for the SRECs.

On August 11, 2020, Kearsarge, through counsel, informed Skyview that it required a letter of credit for the full notional value of Contracts 3, 4 and 6 in the amount of $2,137,500 to be posted by 5:00 p.m. on August 12, 2020. Kearsarge further advised Skyview that it would not transfer the SRECs specified under the contracts until May 2021 and May 2022 respectively, the latest possible day for delivery under the contracts.

The following day, August 12, 2020, Skyview sent its Notice of Termination terminating the contracts.   Skyview demanded Termination Payment in the amount of $342,742, calculated as the cost of cover at the time of termination; i.e., the contract price subtracted from the market price of SRECs on August 12, 2020, multiplied by the number of SRECs to be delivered plus brokers fees.   Kearsarge refused, and Skyview initiated this suit.

CONCLUSIONS OF LAW

## I.   **Applicable Law**

On the eve of trial, Skyview submitted the novel argument that Article 2 of the Uniform Commercial Code ("UCC") should apply to this case.   The UCC, which is codified by Chapter 106 of Massachusetts General Laws, applies to "transactions in goods" which are defined as "all things (including specially manufactured goods) which are moveable at the time of identification to the contract for sale . . . "   Mass. Gen. Laws ch. 106, § 2-105.   The question, therefore, is whether SRECs are goods subject to the UCC.

Although there is no case law on point, Skyview likens SRECs to electricity, which has been found to be a "good" as defined by the UCC.   In re Erving Indus., Inc., 432 B.R. 354, 370 (Bankr. D. Mass. 2010).   Kearsarge responds that SRECs do not meet the definition of "goods" under the UCC because they are not "moveable" or tangible in any way.   In the alternative, Kearsarge argues that

at most SRECs could qualify as "general intangibles" and thus be considered collateral under § 9-102 of the UCC which defines general intangibles as "any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction."[2] Mass. Gen. Laws ch. 106, § 9-102(42).  Kearsarge concludes that even if SRECs were considered intangibles, they would still not be subject to Article 2 of the UCC.

Kearsarge has the better argument.  The Bankruptcy Court in In re Erving Indus., Inc. based its reasoning on the fact that "electricity is tangible and does possess physical properties." Erving, 432 B.R. at 369.  By contrast, SRECs are constructs resulting from state regulations.  As noted by the Second Circuit in a case addressing the application of state and federal law to a utilities contract, "RECs are created by the State and controlled by state law . . . [and] they may be decoupled from the renewable energy."  Wheelabrator Lisbon, Inc. v. Conn. Dep't Pub. Util. Control, 531 F.3d 183, 189 (2d Cir. 2008) (quoting Wheelabrator Lisbon Inc. v. Conn. Dept. Pub. Util. Control, 562 F. Supp. 2d

---

[2] Kearsarge cites to the opinion of a commentator in the renewable energy field which states that SRECs are "intangibles" under the UCC. Financing Solar Renewable Energy Products, LEXOLOGY (May 31, 2011), https://www.lexology.com/library/detail.aspx?g=106d9dea-4642-4ba9-9bcd-ab27adc1ace3.

295, 305 (D. Conn. 2006).   In Massachusetts, SRECs are divorced from the underlying energy, and therefore they do not possess any of the physical properties of a tangible good.   Whether or not SRECs are intangibles for purposes of the UCC need not be decided now.   Under either interpretation, Article 2 does not apply.

As Article 2 is not applicable to this case, Massachusetts contract law will apply.   Under Massachusetts law, "a breach of contract claim requires the plaintiff to show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." Bose Corp. v. Ejaz, 732 F.3d 17, 21 (1st Cir. 2013).   It is undisputed that the six contracts involved in this case, specifically the three terminated contracts, were valid and enforceable.   However, each party claims the other materially breached the contracts.

A material breach of contract occurs when the breach concerns an "essential and inducing feature of the contract." EventMonitor, Inc. v. Leness, 44 N.E.3d 848, 853 (2016).   A material breach by one party excuses the other party from performing under the contract. Quentin Vespa Co. v. Construction Serv. Co., 179 N.E.2d 895, 899 (Mass. 1962); Ward v. Am. Mut. Liability Ins. Co., 443 N.E.2d 1342, 1343 (Mass. App. Ct. 1983).   A party to a contract generally is relieved of its obligations under that contract only

when the other party has committed a material breach, that is, "a breach of 'an essential and inducing feature of the contract.'" Duff v. McKay, 52 N.E.3d 203, 211 (Mass. App. Ct. 2016). Conversely, while a party who commits an immaterial breach may bring an immediate action for damages, it is not entitled to stop performing its obligations under the agreement.  Id.

## II.  **Analysis**

### A.  **Kearsarge Requests Financials Statements**

Kearsarge first requested Skyview's financials on June 15, 2020, citing Section 6.4 of the contracts.  Section 6.4 is triggered when a party has "reasonable grounds to believe that the creditworthiness of the other Party has become unsatisfactory or the ability of the other Party to perform its obligations under this Agreement has become impaired."  Skyview argues that this request constituted a material breach of contract, because no reasonable grounds existed for Kearsarge to doubt either Skyview's creditworthiness or ability to perform.

Kearsarge agrees that the request mistakenly cited to Section 6.4, but explains that in fact it was made pursuant to Section 4.5, which states that either party must provide to the other its "most recently available annual report containing audited consolidated financial statements" upon request.  Kearsarge contends that it was well within its contractual rights to make such a request, and Skyview breached the contract when it

repeatedly failed to produce audited financial statements, instead producing less reliable reviewed statements.

I find that although Kearsarge erroneously made a demand for financials under Section 6.4, it was likely requesting to review financial statements under Section 4.5, because it did not indicate it was concerned about Skyview's ability to perform, nor did it make a demand for security.  Section 4.5 does not place any restrictions on a party's ability to make a request for a counterparty's financials, so Kearsarge was not in breach when it did so.  However, it muddied the waters when it cited the wrong provision.

Skyview was obligated to produce audited financials under 4.5 if it had properly been requested to do so.  However, the fact that Kearsarge only requested the "latest financials" and did not demand audited financials until July 29, 2020 demonstrates that any breach of not providing audited financials was immaterial. Moreover, Kearsarge did not suffer any damages as a result of Skyview's failure to produce audited financials.  Accordingly, Kearsarge's breach of contract claim fails.

### B.   <u>Kearsarge Demands Assurances</u>

Skyview next argues that Kearsarge breached the contracts when it demanded adequate assurances under Section 6.4 without reasonable grounds.  Although Skyview did not provide Kearsarge with audited financial statements, it did provide Kearsarge with

draft, reviewed financials on July 10, 2020 and final, reviewed financials on July 16, 2020.  The draft financials indicated that Skyview's line of credit had expired in June but that it was in the process of being expanded.  The final financials indicated that Skyview's line of credit had been extended on a month-to-month basis and Skyview was in the process of further extending it.  Although Marc Stewart suggested that Bernstein inquire about the line of credit and the lack of audited financials, Bernstein never did so.  Instead, on July 29, 2020, Bernstein demanded that Skyview put up a bond or letter of credit for the full notional value of the three remaining contracts.  Bernstein referred to the expired line of credit referenced in the draft financials, but not the extension contained in the final version.  Indeed, it appears Bernstein never read the final financials where the change in Skyview's line of credit was reflected.

At trial, Bernstein testified that he had good cause to be concerned about Skyview's creditworthiness and the demand for the letter of credit was therefore warranted.  He gave several reasons for his concern.  He testified that he was worried about Skyview's line of credit because it had only been renewed on a month-to-month basis.  This limited extension indicated to him a bank's underlying concerns with the company.  Bernstein testified that prepayment for SRECs as suggested by Karetsky would not address his payment risk because prepayment would happen years in the

future, several days before the SREC delivery date, and he had no guarantee that Skyview would be solvent at that time.  He pointed out the economic uncertainty surrounding the Pandemic.  He believed Skyview's reluctance to put up a letter of credit indicated deeper financial woes.

Bernstein admitted that he "felt betrayed" by Skyview because of the unethical way he believed it had acted during the GEE Bankruptcy.  Revealingly, in his email to Stewart attaching Skyview's financials, Bernstein noted that "these were the guys that sued us."  Trial Ex. 40 at KEARSARGE508.  He believed erroneously that Skyview had to borrow outside capital during the GEE Bankruptcy case.

Finally, Bernstein testified that he believed a letter of credit in the amount of $2,137,500 was commercially reasonable given the uncertainty of the economic times and Skyview's failure to provide audited financials.  Bernstein explained that certain of Kearsarge's other trading partners had previously insisted that Kearsarge post letters of credit for the full amount of the contract under similar circumstances.  Furthermore, Bernstein believed (incorrectly) that it would only cost Skyview $21,000, or 1% of the notional value, to post the letter of credit which, if Skyview's assurances regarding its financial health were to be believed, should not be a problem.

I find that Bernstein's demand for a letter of credit for the full notional value of the contracts (about $2.1 million) was not commercially reasonable and was in bad faith. While it may initially have been reasonable to request assurances after reviewing Skyview's draft reviewed financials which stated that Skyview's line of credit had expired, it was unreasonable to demand a letter of credit without soliciting an explanation after receiving Skyview's final reviewed financials which indicated that Skyview's line of credit had been extended. If Bernstein had talked to Karetsky he would have learned that on July 2, 2020, Citibank preliminarily approved an expansion of Skyview's line of credit to $15 million which was then finalized on August 13, 2020. Although Karetsky tried to talk to Bernstein, Bernstein refused to do so.

Furthermore, within the SREC trade industry, a commercially reasonable demand for adequate assurance should not be higher than the risk that a party faces if the counterparty fails to perform, namely, the cost of cover in the open market. At worst, if Skyview could not pay, then Kearsarge would have to sell the residual SRECs at the clearinghouse auction floor price of $285 per SREC. That would amount in a loss to Kearsarge of $142,000.[3] Posting a letter

---

[3] The loss is calculated as the difference between the contracted number of SRECs sold at the contract price and the same SRECs if they were sold at the auction floor price.

of credit for the full notional value would reduce Skyview's line of credit by $2,137,500 until the SRECs were delivered later. Kearsarge's demand would require Skyview to reduce its line of credit by approximately $1.61 million for ten months and an additional $620,000 for twenty-two months--that is, until performance.   Although Bernstein testified that in other trades counterparties had required Kearsarge put up a letter of credit for the full notional value of the trade, those instances were between an investment grade company (Exelon) and a non-investment grade company (Kearsarge).   In those cases, the investment-grade company bears more risk, therefore it is reasonable for it to demand additional assurances from the non-investment grade company.   Here, however, both parties were non-investment grade, therefore the risk was evenly distributed, and such a demand was not reasonable.

Finally, Bernstein admitted that after the contracts were terminated, Kearsarge had no losses, and in fact profited from selling the SRECs at the higher market price.   At that time, SRECs were selling above the contract price, so if Skyview had defaulted then Kearsarge would have made a profit of approximately $342,000 from selling the SRECs at market price.

Even assuming for the moment that some of Bernstein's concerns about overexposure and payment risk were genuine, he nevertheless owed Skyview a duty to operate in good faith.   "In every contract,

there exists an implied covenant of good faith and fair dealing." Kolbe v. BAC Home Loans Servicing, LP, 738 F.3d 432, 453 (1st Cir. 2013).  A demand for assurance must be made "in accordance with [the] duty of good faith and fair dealing."  Restatement (Second) of Contracts § 251, cmt. d; see id. § 205, cmt. a (referring to good faith as "honesty in fact"); see also Roger Edwards, LLC v. Feddes & Sons, LTD., 387 F.3d 90, 96 (1st Cir. 2004).

Here, Kearsarge owed Skyview a duty of good faith, which Bernstein conceded includes an obligation to have a discussion with a counterparty when an issue arises.  Yet Bernstein never sought a discussion about his credit concerns.  In fact, he stated explicitly that he did not wish to discuss his concerns.  After executing six contracts with Skyview, half of which had been fully performed, Bernstein still rejected any opportunity for Skyview to explain its financial position.  If he had followed up and learned that the line of credit was being extended annually and increased from $8 million to $15 million, it would have made a difference. Neither did he seek to clarify Kearsarge's position regarding the erroneous termination notices it had sent or whether it intended to perform on the remaining contracts.  Indeed, the next communication from Kearsarge was a letter from outside counsel which was riddled with inaccuracies.  For example, it (1) mistakenly stated that Skyview's line of credit had expired even though the final, reviewed financials indicated it had been

extended; (2) took issue with Skyview's "unreviewed" financial statements even though Skyview's statements were reviewed; and (3) demanded that Skyview provide reviewed financials, which Skyview had already done. It appears from these repeated mischaracterizations of Skyview's line of credit that Kearsarge did not bother reviewing Skyview's final financials.

Given that Kearsarge rejected any attempt at cooperation with Skyview, it was unreasonable for it to demand assurances in the form of a bond or letter of credit. Despite a record of full performance between the parties, Kearsarge's demand for a surety for the full notional value of the outstanding trades further supports this conclusion. On June 16, before he had ever seen Skyview's financials, Bernstein indicated to Skyview that he wanted security. Then in his July 15 emails to Stewart, Bernstein informed Stewart that he wanted Skyview to put up collateral and reminded him that Skyview sued Kearsarge. The next day, after receiving Skyview's final financials, Bernstein informed Skyview that Kearsarge required a surety or letter of credit, which he reiterated two weeks later. The inference is clear: Bernstein had decided he would require security from Skyview before he ever reviewed its financials.

Bernstein's testimony that he was concerned about Skyview's creditworthiness is not supported by the evidence. Although Skyview's draft financials may have raised questions about

Skyview's line of credit, Kearsarge never asked for more information.  Quite the opposite--Bernstein repeatedly rejected the opportunity to learn more.  It appears that he did not review Skyview's final financial statements and he refused to engage Skyview in conversation regarding its line of credit.  Furthermore, for all his testimony that Skyview's unaudited financials caused him great concern, he never once asked Skyview for audited financials.  The most compelling part of Bernstein's testimony, and the most logical explanation for the deterioration in the relationship between the parties, was his admission that he felt betrayed by Skyview for its conduct in the GEE Bankruptcy litigation.  However, this is not a reasonable basis for demanding assurances of a counterparty.  Doing so without a reasonable basis was a material breach, as it imperiled the contracts and caused a breakdown between the parties.  As a result of this material breach, Skyview was excused from future performance.

### C.   Skyview Requests Confirmation of Intent to Perform and Financial Statements

On August 10, after Skyview had already asked Kearsarge to confirm its intent to perform under the contracts and received no response, Skyview repeated the question in the form of a demand under Section 6.4.  Skyview simultaneously requested that Kearsarge provide its most recent financial statements pursuant to Section 4.5.  Although Skyview did not prove that the demand to

confirm intent to perform was a valid demand under Section 6.4, any breach is not dispositive, because Kearsarge had already committed a material breach by wrongfully invoking Section 6.4 and terminating the contracts twice.

> ### D.   **Damages**

Having found that Kearsarge materially breached the parties' multiple contracts, the Court must now determine the amount of damages Kearsarge owes Skyview.

A wronged party is "entitled to receive the benefit of the bargain, that is, 'be placed in the same position as if the contract had been fully performed.'" Fecteau Benefits Group, Inc. v. Knox, 890 N.E.2d 138, 143 (2008) (citations omitted).

Here, Section 6.2 of the parties' contracts outlines the Termination Payment due the non-breaching party in the event of default.  The Termination Payment is calculated as the difference between the contract price and the market price of the SRECs at the time of termination plus brokerage fees.  On August 12, 2020, Karetsky emailed Kearsarge the Notice of Termination and Termination Payment in the amount of $342,742.  The Court finds that the amount of $342,742 was derived in compliance with the terms of the contract.  In addition, Skyview is entitled to pre-judgment interest at the statutory rate of 12% from August 15, 2020 to the date of judgment.  Finally, the parties have stipulated

to $250,000 in attorneys' fees.  The Court therefore awards Skyview

a total of $592,742 plus prejudgment interest.

**III.  CONCLUSION**

    Accordingly, judgment is entered for Skyview.  The Plaintiff

shall submit a form of judgment within fourteen days.

    SO ORDERED.

January 13, 2023                          /s/ Patti B. Saris
                                         PATTI B. SARIS
                                         U.S. DISTRICT JUDGE